**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LISA DALTON, et al., | : | CIVIL ACTION NO. 11-887 (MLC) |
|  | : |  |
| Plaintiffs, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| HARTFORD LIFE INSURANCE | : |  |
| COMPANY, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**COOPER, District Judge**

Plaintiffs, Lisa Dalton ("Dalton") and the Dalton Agency (collectively, "Plaintiffs"), brought this action against Defendants, Hartford Life Insurance Company and Hartford Life and Annuity Insurance Company (collectively, "Hartford"), Janis Rose Bevivino ("Bevivino"), and Steve Ruel ("Ruel") (collectively, "Defendants"), alleging claims for employment discrimination and breach of contract, as well as tortious interference with prospective economic gain. (Dkt. entry no. 1, Rmv. Notice, Ex. A, Compl.)  Defendants removed to this Court and moved to dismiss the claims asserted against Ruel and claim four, the tortious interference claim asserted against Hartford, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (Dkt. entry no. 11, Mot. to Dismiss.)  The parties previously stipulated to the dismissal of the breach of contract claims.  (Dkt. entry no. 10, 4-7-11 Order.)  Since the Motion was filed, the parties have also stipulated to the dismissal of all claims against Ruel.  (Dkt.

entry no. 28, 5-12-11 Order.)   Thus, the Court need only consider
claim four here.   The Court determines the Motion without oral
argument.   Fed.R.Civ.P. 78(b).   The Court will grant the Motion
with respect to claim four and will deny the remainder as moot.

## BACKGROUND

Dalton served as an insurance agent (also known as a
"General Agent" ("GA")) for Hartford from approximately September
2003 to April 2010.  (Compl. at 2; dkt. entry no. 11, Def. Br. at
1.)  She reported to a Field Marketing Director ("FMD") named
Miriam Hayden ("Hayden").  (Compl. at 2.)   Dalton, in turn, had
agents (also referred to by the parties as "subagents,"
"producers," or "subproducers") who reported to her.  (Id.)   Her
GA duties included "recruiting, hiring and training producers,
developing territories, providing support and motivation to
producers and sub-producers, delivering and distributing
commission checks, statements, bulletins, notices and other
communications from the FMD.   In addition, [Plaintiffs'] office
served as the main hub through which all of [] Hayden's business
would proceed."  (Id.)

Dalton's relationship with Hartford was governed by four
agreements, a "Producer Contract," a "General Agent Addendum"
("GA Addendum") to the Producer Contract, and two other addenda
not relevant here.  (Compl., Ex. A, Producer Contract; id., Ex.
B, GA Addendum; id., Exs. C & D.)   The Producer Contract

2

that "[Hartford] appoints you as our sales agent to represent us in accordance with this Contract.  You are authorized to solicit and procure applications for Company Insurance policies and annuities," and "you are an independent contractor and are free to exercise your discretion and judgment . . . ."  (Producer Contract at ¶¶ 1-2.)  The Producer Contract states it may be terminated without cause, among other reasons, once it has been in effect for more than 120 days, by either party, with thirty days written notice.  (Id. at ¶ 7.)  It also lists the ways it may be terminated for cause.  (Id.)  Finally, it contains an arbitration provision, which states that "[a]ny controversy or claim occurring under, relating to or in connection with any provisions of this Contract or the breach of such provisions, unless resolved by mutual agreement of the parties, will be finally settled by arbitration . . . ."  (Id. at ¶ 9.)

The GA Addendum states that it "supplements and is part of the Producer Contract between you and [Hartford]."  (See GA Addendum.)  It gives GAs certain rights and responsibilities, including the ability to (1) "recruit and appoint, with our prior approval, Producers and Brokers (Subproducers) who will be assigned to you to solicit and procure applications for our policies," (2) "exercise proper supervision of your Subproducers," and (3) "provide training and support for your Subproducers."  (Id. at ¶ 2.)  Hartford reserves for itself, with regard to a GA's Subproducers, the rights to "approve or reject

3

any of the recruited Subproducers" and "terminate any of your Subproducers, according to the applicable provisions of their Producer Contract," among others.  (Id. at ¶ 3.)  The GA Addendum also states that:

> Both parties agree that the Subproducers shall not be the property of either party and neither party shall have exclusive right to such Subproducers.
> a.  Upon termination of your Producer Contract without cause, we agree, for a period of 90 days, not to enter into an agreement with your Subproducers which includes a higher Schedule of Commissions than the Schedule in effect at the time of your Contract termination.
> b.  Upon termination of your Producer Contract for cause, we may immediately enter into agreements with your Subproducers which may include any Schedule of Commissions which we deem appropriate.

(Id. at ¶ 8.)

According to the Complaint, Dalton "recruited and invested in" her agents by "providing training, purchasing leads and assisting them administratively."  (Compl. at 4.)  As a result, it was "the expectation that [she] would reap the benefits of that investment."  (Id.)  However, the Complaint alleges that:

> On or about April 2010, Defendant Hartford sent notices to all of Plaintiff's agents notifying them of Plaintiffs termination, prior to Plaintiff even receiving notice of said termination and despite a thirty day notice requirement, notifying them of their termination.  Defendant Hartford then informed them that they could sign on with another FMD . . .  Plaintiffs [sic] agents were told that they would get the deferred compensation and paychecks that were being held once they signed up with [another FMD].  Four of Plaintiff's agents, including her best agent, signed up with [another FMD].

(Id. at 4.)  Plaintiffs contend that "[b]y sending the notices of termination to the agents and holding pay, Hartford intentionally

4

interfered with Plaintiff's relationship with her agents and deprived her of the economic opportunity appurtenant with that relationship." (Id.)[1]

**DISCUSSION**

**I.   Legal Standard for Motion to Dismiss**

A motion under Rule 12(b)(6) tests the legal sufficiency of a complaint, and the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). At this stage, a "complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). "[W]here the well-pleaded facts do not permit the court

---

[1] While not relevant to this Motion, the Complaint also alleges, inter alia, that Hartford treated Dalton differently from male GAs, began to improperly account for and wrongfully withhold her commissions, and that her termination was motivated by her gender and by her questioning of Hartford's allegedly irregular business practices. (Id. at 4-6.) The Complaint asserts that Hayden was the only female FMD out of approximately ten, and that Dalton was one of only two female GAs working for Hartford, out of approximately one hundred. (Id. at 3.)

to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--that the 'pleader is entitled to relief.'" Id. at 1950.  In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court may consider the Complaint, exhibits attached thereto, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents.  See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

## II.  Legal Standard Applied Here

The Complaint asserts in claim four that Dalton "sustained economic loss, suffered injury to her present and future career opportunities, and suffered severe emotional distress, humiliation, pain, and suffering" as a result of Hartford's "interfering with Plaintiff's relationship with her agents and customer."  (Compl. at 8.)  Defendants contend that claim four should be dismissed because it is subject to the mandatory arbitration clause in the Producer Contract.  (Def. Br. at 6.)

Both parties assert their side is supported by a decision in a similar action brought by Hayden, who was also terminated by Hartford in 2010.  Hayden v. Hartford Life Ins. Co., No. 10-3424, 2010 WL 5140015 (D.N.J. Dec. 9, 2010).  Defendants argue the Hayden court found that the arbitration clause in the Producer Contract is enforceable and broad enough to cover related torts

such as the tortious interference claim here.  (Def. Br. at 7.)
Plaintiffs counter that Hayden determined the clause did not
reach the alleged interference in Hayden's relationships with her
GAs, which was governed by a separate "Member Contract" lacking
in an arbitration provision.  (Dkt. entry no. 13, Pl. Br. at 8-
10.)  For the first time, Plaintiffs assert this Member Contract
also governed Dalton's relationships with her Subproducers, and
thus the result here should be the same as in Hayden.  (Id. at 8;
dkt. entry no. 23, Ex. D at 4, Member Contract.)

    New Jersey recognizes a cause of action for tortious
interference with one's prospective economic advantage.
Zippertubing Co. v. Teleflex Inc., 757 F.2d 1401, 1406 (3d Cir.
1985).  "The four elements necessary to establish a prima facie
case of tortious interference with a prospective business
relation, as stated in Printing Mart of Morristown v. Sharp
Electronics Corp., 116 N.J. 739 (1989), include: a protectable
right, such as a prospective economic or contractual
relationship; intentional and malicious interference; loss of
prospective gain caused by the interference, and damage."
Starting Nine, Inc. v. Highgate Prods., Inc., No. 92-2417, 1993
WL 235836, at *4 (D.N.J. June 21, 1993).  Here, Defendants do not
contend Plaintiffs have failed to meet their burden of stating a

claim, but rather that the arbitration provision in the Producer Contract requires the claim to be arbitrated.  (Def. Br. at 9.)[2]

When determining whether a claim must be arbitrated "the focus remains on the facts underlying the claim rather than the actual legal terms in which the claim is covered." Caruso v. Ravensword Developers, Inc., 337 N.J. Super. 499, 507 (N.J. App. Div. 2001); EPIX Holdings Corp. v. Marsh & McLennan Cos., 410 N.J. Super. 453, 472-73 (N.J. App. Div. 2009).  "If these factual allegations touch matters covered by the parties' contract, then those claims must be arbitrated, whatever the legal labels attached to them." EPIX, 410 N.J. Super. at 473; see also Jansen

_____

[2] Although the Complaint does not allege the existence of the Member Contract, as in Hayden, it does allege that "Plaintiff recruited and invested in these agents . . . It is the expectation that Plaintiff would reap the benefits of that investment."  (Compl. at ¶ 20.)  See 52 NJPRAC § 33:1 ("New Jersey recognizes two separate torts addressing claims of tortious interference with future economic expectations.  The first concerns interference with contractual relations, and the second concerns non-contractual situations in which the plaintiff had an expectation of a prospective economic advantage.").  The Complaint also alleges Hartford intentionally interfered with this relationship by "sending the notices of termination to the agents and holding pay."  (Id.)  Finally, it pleads loss of prospective gain through the alleged deprivation of "the economic opportunity appurtenant with that relationship."  (Id.)

The Court notes, however, that the Complaint does not claim that, absent the allegedly wrongful acts by Hartford, Dalton would have realized the benefit of the relationship with her Subproducers, given the fact that she was about to be terminated.  See Ford v. Wellmont Health Sys., No. 09-55, 2009 WL 4544099, at *9 (W.D. Va. Nov. 30, 2009) (although plaintiff pleaded existence of business relationship, future expectancy, and defendant's knowledge of same, plaintiff did not show that "had the letter [following his termination] not been mailed to his patients, he would have been able to continue the professional relationship").

v. Salomon Smith Barney, Inc., 342 N.J. Super. 254, 258 (N.J.
App. Div. 2001) (ordering arbitration because even though
"plaintiffs couch their claim as an independent tort action, the
complaint essentially sounds in contract.") (citations omitted);
Wasserstein v. Kovath, 261 N.J. Super. 277, 286 (N.J. App. Div.
1991) ("Notwithstanding the language of the Wassersteins'
complaint sounding in tort, the complaint essentially arises in
contract rather than tort and is governed by the contract.").

Whether the factual allegations of a complaint are within
the scope of the arbitration clause is essentially a question of
contract interpretation, Caruso, 337 N.J. Super. at 505, because
"only those issues may be arbitrated which the parties have
agreed shall be."  Garfinkel v. Morristown Obstetrics &
Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001).  However,
because of a "strong public policy [that] favors arbitration of
dispute resolution," there is a presumption that the dispute
falls within an arbitration clause.  EPIX, 410 N.J. Super. at 471
(internal quotations omitted).  Indeed, "an order to arbitrate
the particular grievance should not be denied unless it may be
said with positive assurance that the arbitration clause is not
susceptible of an interpretation that covers the asserted
dispute."  Id. (internal quotations omitted).  Clauses that use
broad "arising under" or other similar provisions cover torts
related to the contract in addition to contract disputes

themselves.  Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 575
(N.J. App. Div. 2007).

     In Hayden, the court concluded the tortious interference
claim was not arbitrable.  Hayden, 2010 WL 5140015, at *6.
However, Hayden relied heavily on the existence of the Member
Contract, reasoning that "each of Plaintiffs' contract-like
claims involves a contract that does not contain an arbitration
clause"; the Member Contract "does not contain an arbitration
clause and Defendants are not parties to the Member Contracts";
and "[t]he majority of the allegations involve the Member
Contracts and [another contract]," both "without arbitration
provisions."  Id.  Additionally, the Hayden court noted that the
claim corresponding to claim four here "allege[d] tortious
interference with the Member Contracts between Plaintiffs and
their General Agents," and that these contracts did not have
arbitration provisions.  Id.

     If the Complaint were identical to the one in Hayden, the
Court might find Hayden persuasive.  However, unlike in Hayden,
the Complaint here does not allege that the Member Contract is
the source of Dalton's protectable relationship with her
Subproducers.  Notwithstanding Plaintiffs' assertions in
opposition to this Motion, the Complaint alleges Hartford
interfered with some other kind of relationship, and does not
implicate or mention the Member Contract at all.  (See Pl. Br. at

10

10; Compl.)³  Thus, the Court finds the conclusion in <u>Hayden</u> inapplicable to the facts as presented here.

The parties cite very little case law dealing with the question otherwise, though it does exist.  For example, in <u>Empire State Ethanol & Energy, LLC v. BBI Int'l</u>, a claim for tortious interference with prospective contractual relations, which alleged the defendants coerced third parties to abandon plaintiff's project to join defendants' project, was arbitrable because it implicated the contract's confidentiality clause, as well as defendants' duty under the contract to recommend entities like the third parties.  No. 08-623, 2009 WL 790962, at *9 (N.D.N.Y. Mar. 20, 2009).  Similarly, in <u>AmericaOne Payment Sys., Inc. v. First Am. Payment Sys.</u>, the court found a tortious interference claim arbitrable because although the "formal elements" of the claim did not "necessarily depend on the existence and terms of" the agreement allegedly subject to arbitration, litigation of the claim would "require examination

---

³ The Court notes the assertion that because Dalton's name does not appear on the attached Member Contract, rather Hayden's does, it cannot govern Dalton's Subproducer relationships at all. (Dkt. entry no. 26, Def. Reply at 8.)  However, this ignores the accompanying certification.  (Dkt. entry no. 14, Dalton Cert. at 2 ("The Member Contract . . . is the form Member Agreement used by me with all my sub-agents and governs my relationship with the agents.").)  A cursory review of the Member Contract itself reveals its form nature: "This is a Member Contract between AGENCY (American Mortgage Protection Insurance Agency, Inc. and/or M. Hayden Agency, <u>including downline agencies</u>) and You." (Member Contract (emphasis added); <u>see also</u> Dalton Cert. at 3 (describing upline and downline relationships); Pl. Br. at 9.)

of the commercial relationship between the parties created under that agreement." No. 08-1818, 2008 WL 3929893, at *2 (N.D. Cal. Aug. 26, 2008). Finally, in a case where the arbitration clause stated "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be resolved by arbitration," the court found that "while [plaintiff's] complaint sounds in tort and for violation of various Florida statutes, the wrongful acts alleged all relate to specific provisions of the agreement." Info. Tech. & Eng'g Corp. v. Reno, 813 So. 2d 1053, 1054-55 (Fla. Dist. Ct. App. 2002) (citing, and noting identical arbitration clause in, Bos Mat. Handling, Inc. v. Crown Controls Corp., 137 Cal. App. 3d 99, 104 (Cal. Ct. App. 1982)); see also Childs v. Meadowlands Basketball Assocs., 954 F.Supp. 994, 1000 (D.N.J. 1997) (finding plaintiff's claim arbitrable in part because it required "an interpretation or construction" of a clause in plaintiff's contract).

The Court is not persuaded by Defendants' contention that the claim arises from the Producer Contract because of the Complaint's reference to a thirty-day notice requirement. (Def. Br. at 9.) However, Defendants also argue that questions surrounding the termination of Dalton's Subproducers are related to the language in the GA Addendum that gave Hartford the right to terminate and reappoint them. (Def. Br. at 10.) Although Plaintiffs argue they are not claiming "breach of the termination

notice provision of the Producer Contract," the GA Addendum addresses both the manner in which the Subproducers may be terminated by Hartford and the fact that Plaintiffs do not have "exclusive right" to these Subproducers.  (Pl. Br. at 12; GA Addendum at ¶¶ 3, 8.)  Moreover, the GA Addendum describes the conditions under which Hartford may enter into separate agreements with Plaintiffs' Subproducers.  (GA Addendum at ¶ 8.) These provisions in the GA Addendum, among others, will need to be interpreted in addressing Plaintiffs' tortious interference claim.  See Childs, 954 F.Supp. at 1000.

Considering the foregoing cases and facts, the Court determines that the tortious interference claim as pleaded in the Complaint is arbitrable because the allegations relate to the provisions of the Producer Contract that outline Hartford's rights with respect to Plaintiffs' Subproducers, and litigation of the claim will require examination of same.  Thus, the Court will grant the Motion as it pertains to claim four.

**CONCLUSION**

For the reasons discussed, the Court will grant the Motion with respect to claim four and deny the remainder of the Motion as moot.  The Court will issue an appropriate order.

    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated: August 1, 2011

13